# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| RICHARD A. BERCOT, | : | |
| Plaintiff, | : | Case No. 3:08cv00416 |
| vs. | : | District Judge Walter Herbert Rice |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social Security Administration, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I. INTRODUCTION

Plaintiff Richard A. Bercot brings this case pro se challenging the Social Security Administration's decision to deny his application for Disability Insurance Benefits (DIB). Plaintiff claimed in his application that he was under a "disability" within the meaning of the Social Security Act due to cirrhosis of the liver and diabetes, which cause him constant fatigue and other problems. (Tr. 60, 465-66).

Administrative Law Judge (ALJ) Daniel R. Shell held a hearing and later issued a written decision finding that Plaintiff was not under a disability. He consequently denied Plaintiff's DIB application. (Tr. 15-24). ALJ Shell's decision eventually became the Social Security Administration's final decision. This Court has jurisdiction to review such final decisions. *See* 42 U.S.C. §§405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), the administrative record, and

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

the record as a whole.

## II. BACKGROUND

### A. Plaintiff and His Hearing Testimony

Plaintiff asserted in his DIB application that he was under a disability beginning on June 2, 2000. On that date he was forty-four years old. *See* Tr. 50. Plaintiff was under age fifty before his insured status expired. *See* Tr. 17, 22. He is consequently considered a "younger individual" for purposes of resolving his DIB application. *See* 20 C.F.R. §404.1563(c).

Plaintiff graduated from high school in 1975. (Tr. 464). From 1982 to 1997 he performed factory work involving multiple duties as, for example, a machine shop floor manager and a tech writer. (Tr. 61, 462-63).

An attorney represented Plaintiff during his hearing before ALJ Shell. Plaintiff testified during the hearing that he suffers from memory loss, constant fatigue, tremors, confusion, and lack of sleep. (Tr. 465-66). The number one problem preventing him from working is "probably the fatigue and confusion." (Tr. 469).

Plaintiff was hospitalized in May 2001 when he was first diagnosed with diabetes. *Id*. He was also experiencing liver problems. (Tr. 465-66). Plaintiff testified, "As far as any time period, problems with both really hit me hard at the same time." (Tr. 465).

In August 2001 he was diagnosed with cirrhosis of the liver. He understands that the liver disease causes him to have higher levels of ammonia in his blood, which causes his memory problems. (Tr. 466).

In April 2006 Plaintiff began using an insulin pump to treat the diabetes. (Tr, 466-67). He experiences a "full range" of blood glucose levels running from 25 to 400. (Tr. 466).

Plaintiff testified that his tremors were hereditary (all his siblings have them too) and continue to worsen over time. (Tr. 467). He has tremors on the whole left side of his body and on his face, head, and both hands. His hand tremors are the most severe tremors

he experiences, with more left-hand tremors than right. (Tr. 468). He has not really talked with his doctors about the hand tremors, although they know about them. Plaintiff testified, "they said the only cure that they know for it is brain surgery and I said, no." *Id*.

Plaintiff has arthritis, mostly in his right knee and sacrum. He uses a cane to help him walk mostly due to the arthritis. He also uses a cane when he is unsteady from fatigue or for balance. *Id*.

During a typical day, Plaintiff watches a little television, plays with his dog, eats supper with his wife, then watches television with his wife. He might use the computer "for a little bit." (Tr. 469). He logs in entries "for like [his] diabetic information," presumably referring in part to blood glucose readings. (Tr. 469). He lays down for naps but is able to sleep only sometimes. He does not do household chores and does not do yard work, with the minimal exception of pulling some weeds. (Tr. 470). He estimated that the most he could probably lift at one time is ten pounds. If he tried to lift this much repeatedly, he would experience pain in his lower back, and his "shakes would get horrendous." *Id*. He further noted that he "couldn't hang onto anything." *Id*. He is able to drive but his wife does not want him to drive alone because he gets lost at times. *Id*.

Plaintiff estimated that he could comfortably walk 200 or 300 yards but the arthritis in his sacrum prevents him from walking farther. (Tr. 471). He explained that at times he does not sleep at all for days, and he consequently has no energy. On those days, he could not work at all. *Id*. During other days he has a little more energy but only for a few hours. (Tr. 472).

    **B.**    **Additional Evidence**

### 1.

Endocrinologist Stephen J. Burgun, M.D., treated Plaintiff for diabetes. In January 2003 Dr. Burgun wrote a letter stating that Plaintiff was first diagnosed with diabetes in May 2001 and had been treated with insulin since the beginning. (Tr. 250). Dr. Burgun explained, "Because of his liver function tests, he has never been started on oral

medications. (Tr. 250). Plaintiff experienced one reaction of hypoglycemia every other week. *Id.* His hemoglobin A1c was 7.5%.[2] (Tr. 251). Dr. Burgun further wrote that Plaintiff has "apparent type 2 diabetes mellitus in near optimal control." *Id.* Dr. Burgun noted a past medical history of cirrhosis (with no alcohol intake in 21 months), gastric ulcer, asthma, familial tremor, left arm surgery, left knee surgery, hernia repair, and appendectomy. (Tr. 250).

Plaintiff saw Dr. Burgun in June 2003. His hemoglobin A1c was 8.5%. Dr. Burgun noted that Plaintiff's diabetes was, at that time, "in suboptimal control." (Tr. 262).

The administrative record contains the treatment records of Plaintiff's gastroenterologist, Dr. Kirkpatrick, from May 2001 to October 2003. (Tr. 210-44). In November 2006 Dr. Kirkpatrick wrote a letter stating in full:

> [Plaintiff] is totally disabled on the basis of his liver disease. He has cirrhosis of the liver, diabetes. Recent laboratory values shoed a bilirubin 2.1, albumin 3.3, protime/INR 1.2, hemoglobin has improved to 7.1. Problems in addition to his diabetes include hepatic encephalopathy, and ascites. He is on the liver transplant list and his prognosis is fair. He is totally disabled on the basis of his liver disease and unable to work because of his poor strength and energy, and trouble thinking.

(Tr. 408). The next document in the administrative record defines "Hepatic encephalopathy" as "Brain dysfunction directly due to liver dysfunction, most often recognized in advanced liver disease...." (Tr. 409).

In approximately February 2004, Plaintiff's family care physician, Dr. Graham, completed a form and provided various treatment notes and other records. (Tr. 275-93). Dr. Graham indicated that he had first seen Plaintiff in February 2003 and had last seen him in February 2004. (Tr. 275). Dr. Graham deferred to Dr. Kirkpatrick regarding the results of Plaintiff's liver function tests (Tr. 276), and he noted that Dr. Bergun was

---

[2] A non-diabetic's hemoglobin A1c is normally "about 6.0%; in poorly controlled diabetics, the level ranges from 9% to 12%." The Merck Manual at p. 470 (17th Ed. 1999).

4

managing Plaintiff's diabetes and that Plaintiff had reported having about one episode of hypoglycemia per month with his last episode of diabetic ketoacidosis in 2001 (Tr. 277). Dr. Graham observed that Plaintiff had "memory loss – has not worsened but has been persistent since onset of other problems." (Tr. 279). According to Dr. Graham, Plaintiff had difficulties concentrating, some difficulty with persistence, had slow pace, and experienced confusion. *Id*. Dr. Graham observed that Plaintiff had "some difficulties with social interactions – becomes agitated easily," *id*., and he noted that Plaintiff was unable to tolerate stress and that this inability had worsened. (Tr. 280).

In January 2005 Plaintiff saw Dr. Burgun. His hemoglobin A1c was 6.9%, and Dr. Burgun noted that his diabetes was in "excellent blood glucose control on his intensive insulin regimen. (Tr. 325). Later that year, in October 2005, Plaintiff saw another endocrinologist, Elizabeth A. Diakoff, M.D., who reported that his hemoglobin A1c was 9.8% and that he had a random blood glucose of 304. Dr. Diakoff observed that Plaintiff's control over his diabetes "has worsened over the summer. He did not take insulin on days that he is more active, but I suspect that his most recent readings on the insulin indicate that he needs more." (Tr. 323).

In February 2006 Plaintiff again saw Dr. Diakoff, who wrote he was doing very well and that his hemoglobin A1c was 6.3% with random glucose of 184. (Tr. 377). Dr. Diakoff noted that Plaintiff was interested in insulin pump therapy. (Tr. 376). In March 2006 Dr. Diakoff completed a form opining that Plaintiff "is not incapacitated unless he develops hypoglycemia, which has been occurring on a more frequent basis as adjustments are made in this treatment." (Tr. 378).

Plaintiff explains in his Statement of Errors that he started using an insulin pump in April 2006. (Doc. #8 at 6).

## 2.

Plaintiff began psychological counseling in August 2002 psychologist Fred M. Sacks, Ph.D. and with a licensed therapist. (Tr. 209). In his Statement of Errors, Plaintiff

5

explains that he did not see Dr. Sacks "for counseling for depression. The counseling was a requirement from Ohio State University Hospital to show that I indeed was and would remain alcohol free in order to qualify me to go on the Liver Transplant List." (Doc. #8 at 7). Plaintiff was on the National Deceased Liver Transplant list as of the time he filed his Statement of Errors. *See id*. at 12, 17.

In November 2003 Dr. Sacks diagnosed Plaintiff with alcohol dependence in remission, panic disorder with agoraphobia, and depression. (Tr. 333). Dr. Sacks described Plaintiff's affect as anxious, his mood was moderately depressed, and his thinking was disjointed. (Tr. 332). Dr. Sacks reported that Plaintiff was "self isolative" and "avoids contact with others due to pronounced anxiety," was comfortable only at home, avoids public places, "become extremely anxious in public," and "appears to be unable to work due to panic attacks." *Id*.

In April 2003 Plaintiff's therapist and Dr. Sacks signed a letter, which stated, in pertinent part:

> As you know, there is a family history of alcoholism. Mr. Bercot acknowledges his own addiction to alcohol. I am inclined to believe that he hasn't relapsed since he ceased drinking when he was diagnosed with liver problems approximately twenty-two months ago.
>
> Mr. Bercot has been a compliant and motivated client. He currently lives a quiet life with his wife of many years.
>
> He struggles with numerous health problems, but he missed only one session due to illness.
>
> It does not appear that additional counseling is needed at this time....

(Tr. 209).

In April 2004 psychologist Michael J. Wuebker, Ph.D. examined and tested Plaintiff at the request of the Ohio Bureau of Disability Determinations (Ohio BDD). Dr.

6

Wuebker diagnosed Plaintiff with dysthymic disorder and assessed his GAF[3] at 55 referring to "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 34.

Dr. Wuebker opined that Plaintiff's mental ability to relate to others, including fellow workers and supervisors was mildly impaired; his ability to understand, remember and follow directions was moderately impaired; his mood and memory problems would moderately impact his ability to understand, remember and follow directions at work; his ability to maintain attention, concentration, persistence, and pace to perform repetitive tasks was moderately impaired; and his ability to withstand the stress and pressure associated with day-to-day work was moderately impaired. (Tr. 305).

In June 2004 psychologist J. Rod Coffman, Ph.D. reviewed the record for the Ohio BDD. Dr. Coffman diagnosed dysthymic disorder. (Tr. 310). He checked boxes indicating that Plaintiff had a mild degree of limitation in three areas: activities of daily living; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence, or pace. (Tr. 317). Dr. Coffman also indicated that Plaintiff had no episodes of decompensation. *Id*. Dr. Coffman opined, in part, that Plaintiff's "[m]emory allegation is only partially credible. While his depression and physical conditions may pose mild limits on conc/memory, he tested in the average range of intellect and memory functioning. [He] has some mild concentration, memory limits and occasional difficulty with social interactions. He can understand and carry out simple multistep and some moderately detailed tasks. He would do best at tasks allowing solo work and not requiring freq[uent] interaction with coworkers." (Tr. 322).

---

[3] Health care professionals use the GAF (Global Assessment of Functioning) scale to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at 32-34.

**3.**

During the ALJ's hearing, Henry Maimon, M.D., testified about his review of Plaintiff's medical records and about his opinions. (Tr. 472-80). Dr. Maimon described various information in those medical records including, for example, Plaintiff's diagnoses of diabetes (May 2001); alcoholic liver disease (April 2002); alcoholism with no relapse (April 2003); dysthymic disorder with "mild impairment" (April 2004) and with "no severe limitation" (June 2004); and 20/20 vision in both eyes with no retinopathy (September 2005). (Tr. 472-74). Dr. Maimon reported that an endocrinologist, Dr. Elizabeth Diakoff, evaluated Plaintiff in January 2005 and "gives the diagnosis diabetes mellitus with 'excellent blood glucose control.'" (Tr. 474). Dr. Maimon testified that Phillip Edwards, D.O., performed an orthopedic evaluation, diagnosing osteoarthritis of the right knee (September 2005). (Tr. 474). Lumbosacral "spine films" showed spina bifida occulta and arthritis of the left sacroiliac joint (November 2004). (Tr. 474-75, citing Tr. 343). Dr. Maimon also described Plaintiff's various lab test results. (Tr. 472-75).

Dr. Maimon opined, with supporting explanation, that Plaintiff did not meet or equal the criteria for Listing 5.05 (chronic liver disease). (Tr. 475-76).

When asked by the ALJ to assess Plaintiff's residual functional capacity before June 30, 2005 (his date last insured for DIB purposes), Dr. Maimon testified, "If you look at this chart with all the documentation I don't think there are any limitations at all. I mean..., there's nothing in here about these tremors in the chart. I don't think he could be a watchmaker or something like that but there's nothing in here that says this gentleman can't work." (Tr. 476).

Upon questioning by Plaintiff's counsel, Dr. Maimon acknowledged that fatigue "can be associated with cirrhosis. But ... when you see fatigue with somebody with cirrhosis usually the liver function studies are abnormal.... That's not the case the last two, three, four years in this case...." (Tr. 477). Dr. Maimon then explained that when

8

Plaintiff was drinking heavily in 2001, his liver function studies were abnormal ("his bilirubin was up"), "[a]nd he must have done something where he took a turn to the better and quit drinking. But since ... 2001 he's gradually gotten better. As a matter of fact, in 2003..., his liver studies are normal...." (Tr. 477). Dr. Maimon also opined that Plaintiff's liver disease would not explain his fatigue, noting, "There are people walking around with cirrhosis that are practicing physicians, lawyers, anything you want." (Tr. 478).

## III. ADMINISTRATIVE REVIEW

### A. "Disability" Defined

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. *See* 42 U.S.C. §423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

The term "disability" – as defined by the Social Security Act – carries a specialized meaning of limited scope. Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

### B. ALJ Shell's Decision

ALJ Shell resolved Plaintiff's disability claim by using the five-Step sequential evaluation required by the Regulations. *See* Tr. 15-24; *see also* 20 C.F.R. §§404.1520(a)(4).

The ALJ concluded, in pertinent part, that Plaintiff has severe impairments of "cirrhosis of the liver, stable; diabetes mellitus; and a dysthymic disorder" (Step 2); he did not have an impairment or combination of impairments that meets or equals the criteria in the Commissioner Listings[4] (Step 3); and the ALJ concluded that Plaintiff retained the residual functional capacity to perform a limited range of medium work[5] (Step 4) as follows:

> [Plaintiff] is limited to simple, one- and two-step job instructions that are considered to be low stress. Low stress is defined as jobs that do not involve direct dealing with the public, production quotas, or over the shoulder supervision.

(Tr. 20). The ALJ then found that Plaintiff was unable to perform his past relevant work (again Step 4), and that he could perform a significant number of jobs in the national economy (Step 5).

The ALJ's findings throughout his sequential evaluation led him to conclude that Plaintiff was not under a disability and thus not eligible for DIB. (Tr. 15-24).

### IV. JUDICIAL REVIEW

Judicial review determines whether substantial evidence in the administrative record supports the ALJ's factual findings. *Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742,

---

[4] The Listings are found at 20 C.F.R. Part 404, Subpart P, Appendix 1.

[5] A claimant's "residual functional capacity" is an assessment of his or her remaining capacity for work – what the claimant can and cannot do – once his or her limitations have been considered. 20 C.F.R. §404.1545; *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002). Under the Regulations, "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds...." 20 C.F.R. §404.1567(c).

745-46 (6th Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "'more than a scintilla of evidence but less than a preponderance...'" *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review for substantial evidence is deferential not *de novo*. *See Cruse v. Commissioner of Social Sec.* 502 F.3d 532, 540 (6th Cir. 2007); *see also Cutlip v. Secretary of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). An ALJ's factual findings must be upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Once substantial supporting evidence is found in the administrative record, courts do not consider whether they agree or disagree with the ALJ's findings or whether the administrative record contains contrary evidence. *Rogers*, 486 F.3d at 241; *see Her*, 203 F.3d at 389-90.

Substantial evidence is not the analytical ending point. Judicial review further considers whether the ALJ "applied the correct legal criteria." *Bowen*, 478 F.3d at 746. If the ALJ does not, the decision may not be upheld even if the findings are supported by substantial evidence. *See id*. For example, a decision will not be upheld where the ALJ failed to apply mandatory procedural rules and standards established by the Commissioner's Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right. *See id*. (and cases cited therein).

## V.   DISCUSSION

Plaintiff's Statement of Errors lists fourteen "Items," each challenging a specific statement or finding in the ALJ's decision. Plaintiff supports each Item with many specific arguments and references to the evidence of record.

Plaintiff's Items challenge the following statements by the ALJ at Step 2 of his sequential analysis:

11

> The claimant was admitted to Wilson Memorial Hospital on May 3, 2001, complaining of weakness and the discharge summary noted that he was a heavy drinker and exhibited symptoms consistent with cirrhosis of the liver and diabetes mellitus. Treatment records from Digestive Specialty Care demonstrate that the claimant's liver functions and overall health, including control of blood sugar levels, improved with abstinence of alcohol. Laboratory studies confirm improved liver functions with generally normal values. Liver MRI scan on April 18, 2003, was consistent with cirrhosis of the liver, but revealed no evidence of hepatocellular carcinoma. On October 16, 2003, Dr. Kirkpatrick, the claimant's gastroenterologist, reported that the claimant was abstinent from alcohol for two years with better control of his diabetes and that his cirrhosis was stable.... On April 4, 2004, Dr. Kirkpatrick again reported that the claimant's liver condition was stable, although he did exhibit some mild abdominal fluid. Additional laboratory studies do not reveal significant liver function abnormalities....
>
> .... The record also reflects that insulin pump therapy has been started.[6] ...
>
> .... The claimant received mental health treatment from Fred Sacks, Ph.D. for a short time from August 21, 2002, through January 8, 2003.... Such a score is indicative of no more than moderate symptoms and/or moderate difficulty in social and/or occupational functioning.... However, this directly conflicts with his report of April 4, 2003, in which Dr. Sacks stated that additional counseling was not needed at that time. Treatment notes from Timothy Graham, M.D., document a complaint of memory loss on February 6, 2004.... The claimant was evaluated by Michael Wuebker diagnosed a dysthymic disorder and assigned a GAF of 55, which as noted above, is indicative of no more than moderate symptoms and/or moderate difficulty in social and/or occupational functioning....

(Doc. #8 at Items 1 through 13)(quoting Tr. 17-18; footnoted added; ALJ's footnotes omitted). Plaintiff contends for many reasons that these statements are false or incorrect. However, although Plaintiff considers some evidence of record contrary to these findings,

---

[6] At this point in Item 8, Plaintiff states, "Date of record 12/03/03" and argues that this is incorrect since he did not actually start on an insulin pump until April 2006. (Doc. #8 at 6). It does not appear that the ALJ found or believed that Plaintiff started using an insulin pump on 12/03/03. *See* Tr. 18. And, even if the ALJ did make this finding, it would not be reversible error since the ALJ found Plaintiff's diabetes to be a severe impairment at Step 2 of his sequential evaluation. *See* Tr. 17-18.

other substantial evidence – especially the records upon which the ALJ relied, *see* Tr. 17-18 (nn. 1-9, 11-12) – supports the ALJ's findings. In addition, Plaintiff's challenges to Items 1 through 13 do not demonstrate the existence of reversible error because the ALJ made these statements or findings at Step 2 of his sequential analysis where he found – in Plaintiff's favor – that he had several severe impairments including cirrhosis of the liver, stable; diabetes mellitus; and a dysthymic disorder." (Tr. 17). Plaintiff therefore succeeded in convincing the ALJ at Step 2 that he had these severe impairments, and this caused the ALJ to continue his sequential analysis by considering Plaintiff's severe and non-severe impairments at the remaining Steps of his sequential evaluation. *See* Tr. 19-23. As a result, Plaintiff's Items and arguments reveal no reversible error in the findings he challenges at Step 2 of the ALJ's sequential evaluation. *See Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 2008)(citing *Maziarz v. Sec't, of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Next, Plaintiff's arguments and the remaining two sections of his Statement of Errors mainly challenge the ALJ's reliance on Dr. Maimon's opinions and the ALJ's findings with regard to other medical sources of record.

ALJs evaluate medical source opinions under a well-established set of legal criteria, beginning with a claimant's treating physicians. *See* 20 C.F.R. §404.1527(d). The treating physician rule, when applicable, requires ALJs to place controlling weight on a treating physician's opinion rather than favoring the opinion of a nonexamining medical advisor, or an examining physician who saw a claimant only once, or a medical advisor who testified before the ALJ. *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004); *see Lashley v. Secretary of Health and Human Services,* 708 F.2d 1048, 1054 (6th Cir. 1983); *see also* 20 C.F.R. §404.1527(d)(2), (e), (f). A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. *Wilson*, 378 F.3d at 544; *see Walters v. Commissioner of Social Security*, 127 F.3d 525,

13

530 (6th Cir. 1997); *see also* 20 C.F.R. §404.1527(d)(2).

If a treating physician's opinion is not given controlling weight, then it must be weighed against other medical source opinions under a number of factors set forth in the Commissioner's Regulations – "namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544 (citing 20 C.F.R. §404.1527(d)(2)).

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. §404.1527(d)(1). However, the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views nonexamining sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization. *See* 20 C.F.R. §404.1572(d), (f); *see also* Ruling 96-6p at *2-*3.

Plaintiff's challenges to the ALJ's reliance on Dr. Maimon's opinions are not well taken. The ALJ applied the regulatory factors of supportability and specialization to Dr. Maimon's opinions and considered those opinions in light of the evidence of record at Steps 3 and 4 of the sequential evaluation. *See* Tr. 19-21. In doing so, the ALJ applied the correct legal criteria to Dr. Maimon's opinions. The ALJ, moreover, supported his evaluation of Dr. Maimon's opinions by referring to specific substantial evidence of record. *See id.* The same is true of the ALJ's evaluation of Dr. Sacks' opinions and Dr. Wuebker's opinions concerning Plaintiff's mental work limitations and abilities. *See* Tr.

18-21.

In addition, the ALJ's assessment of Plaintiff's liver impairment at Step 3 and his assessment of Plaintiff's residual functional capacity at Step 4 – which considered Plaintiff's physical and mental work limitations – are supported by substantial evidence, including Dr. Maimon's opinions, Dr. Sacks' April 2003 opinion that Plaintiff did not need additional counseling, and the opinions of Dr. Wuebker and Dr. Coffman. *See* Tr. 18-21. The Commissioner correctly asserts that the ALJ reasonably combined the opinions concerning Plaintiff's mental work abilities and limitation to find that he retained the mental residual functional capacity to perform simple, one- and two-step work, and low stress work limited to no direct dealing with the public, no production quotas, and no over-the-shoulder supervision. *See* Tr. 20-22.

Plaintiff lastly provides his conclusion and his commentary. In these final portions of his Statement of Errors, Plaintiff conveys his sincere belief that his impairments, particularly (but not limited to) cirrhosis of his liver – which has necessitated his placement on the National Liver Transplant List – constitute a disability within the meaning of the Social Security Act. Plaintiff also expresses frustration regarding, in part, the difficulty of establishing a disability under the Social Security Act and its accompanying Regulations and the ALJ's reliance on Dr. Maimon's opinions. Although Plaintiff's frustration is understandable, especially in light of his serious health issues and given the narrow definition of a "disability" under the Social Security Act, his Statement of Errors does not show that the ALJ's Decision either failed to apply the correct legal criteria or was unsupported by substantial evidence.

Accordingly, Plaintiff's Statement of Errors lacks merit.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's final non-disability determination be affirmed; and

2. The case be terminated on the docket of this Court.


December 8, 2009

                                                s/ Sharon L. Ovington
                                                   Sharon L. Ovington
                                            United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).